**E. B. E., INC., Plaintiff,**

v.

**DUNKIN' DONUTS OF AMERICA, INC.,
and Michigan Donuts, Inc.,
Defendants.**

**Civ. A. No. 36752.**

United States District Court,
E. D. Michigan, S. D.

July 2, 1971.

Sidney L. Frank, Keywell & Rosenfeld, Birmingham, Mich., for plaintiff.

Herbert Burdick, Detroit, Mich., for defendants.

KAESS, Chief Judge.

Counts I and II of plaintiff's complaint set forth plaintiff's claims under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiff alleges that defendants violated the antitrust laws by including an illegal tying agreement in the sale of the Dunkin' Donut franchise. More specifically, plaintiff claims that as an express condition to obtaining a Dunkin' Donut franchise, plaintiff was required to purchase all necessary operating equipment from Dunkin' Donuts at inflated prices, to install signs purchased and/or leased from Dunkin' Donuts, and to rent the building and land from defendants at excessive rates. In addition, Count I further asserts that defendants violated Section 1 of the Sherman Act by illegally combining with suppliers to restrict plaintiff in its attempts to purchase materials in a competitive market; however, this portion of Count I has not been made the subject matter of this motion by defendants for summary judgment.

From the record established to date in this matter, one theme is consistently evident: Plaintiff sought and desired a packaged, ready-to-go business operation. The plaintiff's officers, Mr. and Mrs. Edwards, were perfectly willing to rely on defendants' services in assembling the business package, and it never occurred to them to do otherwise. It was defendants' ability to deliver such a package that was attractive to the plaintiff. Far from claiming that she and her husband were forced to accept the equip-

ment, the property lease and the signs as a condition for obtaining the franchise, Mrs. Edwards asserts merely that it was never affirmatively impressed upon them that they could buy from other sources.

This factual setting gives rise to the central issue herein: Is a defendant liable for an allegedly illegal tying agreement if it has neither compelled nor coerced the franchisee to make the "tied" purchases? The answer is not an obvious one, for, as demonstrated by the briefs submitted in this matter, the leading cases contain language which would appear to support either result. After careful consideration of the authorities, however, the Court feels that a plaintiff must be able to demonstrate some element of coercion to establish an illegal tying agreement.

One of the earliest authorities addressing itself to this question is the District Court decision in United States v. Loew's, Inc., 189 F.Supp. 373 (D.C. N.Y.1960). That case dealt with the package or block sale of motion picture films to television stations. The court made it clear, however, that there was a difference between merely selling products as a package rather than separately, and the refusal to sell except as a package. It is only the refusal to deal except on a package basis that is illegal:

> "In the first place, it is clear that the defendants had a legal right to *offer* their films in blocks or groups. (Footnote omitted). An *offer* to license in blocks or groups is not illegal, but a conditioning of the license of one or more films upon whether or not other feature films were also licensed is illegal. Therefore, the great mass of evidence introduced to show that the defendants offered their films in blocks or groups, while relevant as background material, is not in and of itself proof of conditioning or block-booking. The Government had to establish, in addition, that defendants refused to license films except in blocks or groups. The Court, in its findings of fact, finds block-booking

to exist only in those cases where the facts show such *refusal* to license one or more films and show that such refusal constituted a condition, in that it was imposed in order to compel the respective licensees to purchase other and additional films."

\*    \*    \*    \*    \*    \*

> ". . . is a *demand* a prerequisite to a finding of refusal? There may be an inference that it is in certain opinions in treble-damage actions. J. J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 1954, 212 F.2d 840, 845; Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 2 Cir., 1959, 268 F.2d 246, 251, certiorari denied 1959, 361 U.S. 885, 80 S. Ct. 156, 4 L.Ed.2d 121; Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561, 568, certiorari denied 1952, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680. This may well be a rule of law applicable as to the allowance of damages in a private anti-trust action."

189 F.Supp. at 380–381.

In the present case, it is clear that the plaintiffs never attempted, desired, or demanded to deviate from the "package approach", nor did the defendants refuse to deal except on that basis. In the Supreme Court decision of United States v. Loew's, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the court did not disturb the trial court's holding that only the refusal to sell separately would be found illegal. Indeed, this aspect of the lower court's holding was heavily engrafted into the Supreme Court decision (see Appendix).

In American Mfrs. Mut. Ins. Co. v. American B–P Theatres, Inc., 446 F.2d 1131 (C.A.2, 1971), the court was also confronted with the question of whether there must be a refusal to sell except as a package, with the result that the package sale could be considered the result of coercion:

> "In Loew's the 'acts found to be illegal' were those of motion picture

distributors who conditioned the license and sale of feature films on the acceptance of unwanted or inferior films. The 'gravamen' of the complaint was the '*successful pressure* applied to television station customers to accept inferior films * * *.' *Id.* 371 U.S. at 40, 83 S.Ct. at 99 (emphasis added). Here, ABC exerted no pressure on Kemper, successful or not. We agree that it is not decisive, as Kemper correctly asserts, that Kemper found the August 15 contract economically advantageous given the available alternatives, since that is a necessary characteristic of most contracts, including illegal ones. *But there can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice.*

"Tying arrangements are abhorred by the courts primarily because they foreclose a substantial quantity of business to competitors and extend pre-existing economic power to new markets for no good justification. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 500–501, 89 S.Ct. 1252, 22 L.Ed. 495 (1969). *Foreclosure implies actual exertion of economic muscle,* not a mere statement of bargaining terms which, if they should be enforced by market power, would then incorporate an illegal tie." 446 F.2d at 1137 (emphasis added).

The court also held that not only must there be a refusal and an attempt to coerce by the vendor, but also that the vendee was under a duty to reasonably and seriously negotiate for separate or individual sales. No such negotiations took place in the instant case.

Likewise, in Belliston v. Texaco, Inc., 455 F.2d 175 (C.A.10, 1972), it was held that there must be a coerced package sale to a reluctant buyer who would have otherwise desired to purchase separately. The seller must be guilty of "coercive conduct". See also, Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (C.A.5, 1965); MDC Data Centers, Inc. v. International Business Machines Corp., 342 F.Supp. 502 (D.C.Pa.1972).

Finally, the Court finds instructive the decision in Capital Temporaries, Inc. of Hartford v. Olsten Corp., 365 F.Supp. 888 (D.C.Conn.1973). An illegal tying agreement was alleged by the plaintiff, and the parties filed cross-motions for summary judgment. The court made this prefatory comment:

"It must be emphasized that *Fortner* does not hold that the mere existence of economic power in a seller is enough to meet the first criterion needed to establish the illegality of a tie-in. The economic power must not simply exist; it must be used. '[T]here can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice.'" (Citations omitted). 365 F.Supp. at 892.

And continuing, at 893:

"In defining the evil proscribed, all the cases talk about the power of sellers to force buyers to purchase products they might choose not to obtain from the seller if the tying arrangement did not obstruct free competition."

The court then denied plaintiff's motion with language particularly apposite to the instant case:

"The principles enunciated in Amer. Mfrs. Mut. Ins. Co. v. Amer. B–P Theatres, *supra,* command that the motion be denied. The record is utterly devoid of evidence that Zessos was in any way coerced or compelled to open a Handy Andy office. To state the crucial point another way, there is no indication whatever that Zessos attempted to free himself from the supposed burden of having to open a Handy Andy office, or that he bargained with Olsten for a white-collar franchise alone." 365 F.Supp. at 894.

For the stated reasons, the court held there was no illegal tying agreement, and concluded the matter by granting defendant's motion for summary judgment.

In light of the foregoing facts and authorities, there has been no showing of an illegal tying agreement as proscribed by either § 1 of the Sherman Act or § 3 of the Clayton Act. Mindful of the heavy burden imposed on defendants seeking summary judgments in antitrust matters, this Court nevertheless feels that there are no genuine issues of material fact, and defendants are entitled to judgment with respect to those portions of plaintiff's complaint alleging an illegal tie-in.

It is so ordered.

## APPENDIX

Extracts from United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

1. At page 40, 83 S.Ct. at page 99:

   A. "The successful pressure applied to television station customers to accept inferior films along with desirable pictures was the gravamen of the complaint."

2. At page 41, 83 S.Ct. at page 100:

   A. "He concluded that only 25 of the contracts were illegally entered into. Nine of these belonged to defendant C & C Super Corp., which had an admitted policy of insisting on block booking that it sought to justify on special grounds."

   B. ". . . defendant Loew's, Incorporated . . . had refused their requests for permission to select among the films in the groups."

   C. "The judge accepted the testimony of station officials that they had requested the right to select films and that their requests were refused."

3. At page 42, 83 S.Ct. at page 100:

   A. "Station WJAR of Providence . . . had asked first if certain films it considered undesirable could be dropped from the offered packages and was told that the packages could not be split."

   B. "Station WMAR wanted only 10 Selznick films, but was told that it could not have them unless it also bought 24 inferior films . . ."

   C. "Station WBRE . . . requested and was refused the right to eliminate undesirable features."

   D. "Station WWLP of Springfield, Massachusetts, inquired about the possibility of splitting two of the packages, was told this was not possible, . . ."

   E. ". . . KPIX requested and was denied permission to eliminate undesirable films from the package."

   F. "Station WJAR wanted to drop 10 or 12 British films from this defendant's 'Champagne 58' package, was told that none could be deleted . . ."

4. At page 43, 83 S.Ct. at page 101:

   A. "The 'Top 39' were licensed by WAAM of Baltimore for $40,000 only after receipt of a refusal to sell 13 of the 39 films in the package. Station WHTN of Huntington, West Virginia, purchased 'Award 52' for $16,900 after United Artists refused to deal on any basis other than purchase of the entire 52 films. Thirty-nine films were purchased by WWLP for $5,850 after an initial inquiry about selection of titles was refused."