**Paul J. BOGOSIAN, et al., Class Representatives**

v.

**GULF OIL CORPORATION, et al.**

**Civ. A. Nos. 71–1137, 71–2543.**

United States District Court, E.D. Pennsylvania.

Aug. 1, 1984.

David Berger, H. Loddie Montaque, Jr., Warren D. Mulloy, Mortin I. Twersky, Stephen D. Ramos, Patricia A. Fanelli, Philadelphia, Pa., Harold Brown, J. Lee Riccardi, Boston, Mass., Norman Zarwin, Philadelphia, Pa., for plaintiffs.

William Simon, P.C., William R. O'Brien, David C. Eddy, Edwin H. Wheeler, Howrey & Simon, Washington, D.C., Robert J. Decker, William G. Winters, Jr., Houston, Tex., John T. Clary, Media, Pa., for Shell Oil Company.

Milton Handler, Ira S. Sacks, Claire S. Hancock, Michael A. Lynn, Kaye, Scholer, Fierman, Hays & Handler, New York City, Joseph P. Foley, Terri J. Frank, Mark D. Litvack, White Plains, N.Y., Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., for Texaco Inc.

Allen F. Maulsby, Cravath, Swaine & Moore, New York City, Robert P. Taylor, Edward V. Anderson, Pillsbury, Madison & Sutro, San Francisco, Cal., for Chevron Oil Company.

Adlai Hardin, Milbank, Tweed, Hadley & McCloy, New York City, Averill M. Wiliams, Associate General Counsel, Amerada Hess Corporation, New York City, James G. Rosenberg, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Amerada Hess Corporation.

John H. Lewis, Jr., Jay H. Calvert, Jr., Joseph B.G. Fay, Morgan, Lewis & Bockius, Philadelphia, Pa., Charles W. Matthews, Jr., Houston, Tex., for Exxon Corporation.

Anthony S. Genovese, Norma B. Levy, Kissam, Halpin & Genovese, New York City, Hoyt H. Harmon, Jr., Houston, Tex., Carole B. Dotson, Ardmore, Pa., for Gulf Oil Corporation.

Fred H. Bartlit, Jr., Jeffrey J. Kennedy, Kirkland & Ellis, David L. Doyle, Chicago, Ill., Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Amoco Oil Company.

Charles I. Thompson, Jr., Michael L. Lehr, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Donald A. Bright, Los Angeles, Cal., for Atlantic Richfield Company.

Andrew J. Kilcarr, Kevin B. Clark, Donovan, Leisure, Newton & Irvine, Washington, D.C., John Wilkinson, Donovan, Leisure, Newton & Irvine, Charles F. Rice, New York City, Edward C. Mengel, Jr., White & Williams, Philadelphia, Pa., for Mobil Oil Corporation.

Ralph W. Brenner, Howard D. Scher, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Lewis J. Ottaviani, John B. Swertsen, Bartlesville, Okl., for Phillips Petroleum Company.

## OPINION AND CLASS ACTION ORDER NO. 126

VANARTSDALEN, District Judge.

### I. *Background*

Class Action Order No. 63, entered February 8, 1983, provided a detailed schedule for pretrial proceedings. That order, as amended, provided that "dispositive motions" were to be filed on a specified date, which was to be after the conclusion of discovery, excluding deposition discovery of certain trial "fact" witnesses. All remaining defendants[1] have filed, either

---

1. Of the original fifteen defendants, Sun Oil Company and Getty Oil Company entered into agreements of settlement that have been approved by the court. The remaining thirteen defendants are: Amerada Hess, Amoco Oil Company, Atlantic Richfield Company, BP Oil, Inc., Chevron Oil Company, Cities Service, Exxon Corporation, Gulf Oil Corporation, Mobil Oil

jointly or individually, motions for summary judgment and decertification of the class. Extensive briefs have been filed and two days of oral argument were held on the motions.[2] To be decided is whether this case shall proceed to trial, and, if so, whether as a class action.

Subsequent to the opinion of the court of appeals in *Bogosian v. Gulf Oil Corporation*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), I certified a nationwide class of plaintiffs composed of all gasoline service station dealers who, during the class period of May 11, 1967 through December 31, 1977, leased their respective gasoline service stations from any of the fifteen defendants. The plaintiffs seek treble damages under section 1 of the Sherman Act, and injunctive relief. In the pending motions, defendants, not surprisingly, raise numerous issues, including many of the same issues raised in the original motions to dismiss and in opposition to class certification. However, because discovery is virtually complete, and a substantially full record, through depositions, pleadings, and responses to discovery requests, is available for review, defendants contend that it is abundantly clear that (1) plaintiffs cannot present sufficient evidence at trial to defeat a motion for a directed verdict; and (2) that individual issues are so extensive as to preclude an adjudication on a class-wide basis.

The court of appeals has ruled in *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 257–259 (3d Cir. 1983), that a district court may rule upon summary judgment motions under Federal Rule of Civil Procedure 56 in protracted cases, based on the developed record where the record is complete, proper notice has been given, and the party resisting the motion has a fair opportunity to present facts essential to justify its position. Although plaintiffs have, to some extent, asserted that at trial they will have "more" or "different" evidence to present, plaintiffs do not contend that the record is not sufficiently established to rule on the motions. The plaintiffs do, of course, maintain that as to many of defendants' contentions, there are issues of material fact in dispute that must be determined by a jury at trial.

The essence of plaintiffs' claim is that the defendant oil company refiners as landowner-lessors in combination with each other impose illegal tie-in agreements upon the lessee service station dealers in the leasing of their respective service stations, by requiring the lessees to buy and sell only the gasoline supplied by their respective lessors.

A brief review of the thirteen-year procedural chronology of the case is in order. On December 19, 1973, I entered a memorandum opinion and order refusing to certify a class action on behalf of plaintiffs. *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973), *vacated*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Subsequently, on April 15, 1975, I granted the motions for summary judgment of defendants Exxon, Shell and Getty.[3] *Bogosian v. Gulf Oil Corp.*, 393 F.Supp. 1046 (E.D.Pa. 1975), *vacated*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). On July 21, 1977, the Court of Appeals for the Third Circuit

---

Corporation, Phillips Petroleum Company, Shell Oil Company, Texaco, Inc., and Union Oil Company.

**2.** Approximately 1,250 pages of memoranda in support of the motions, responses and replies were submitted to the court, with approximately five times that amount submitted in various appendices. I reviewed all of the memoranda in support of the parties' positions and parsed the appendices when necessary. June 25, 1984 was devoted to oral argument on the motions

for summary judgment; the following day for the decertification motions.

**3.** Summary judgment was granted in favor of Shell and Getty against both Paul J. Bogosian and Louis J. Parisi, the individuals who filed the original actions. Summary judgment in favor of Exxon was granted as to Bogosian but not Parisi because as an Exxon lessee-dealer, Parisi had a possible vertical tying claim against Exxon. *Bogosian,* 393 F.Supp. at 1053.

vacated and remanded both the denial of class certification and the grant of summary judgment. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). I thereafter certified a class of "[a]ll present and all former gasoline service station lessee-dealers of any of the defendants who are or were lessee-dealers of any of the defendants at any time between May 11, 1967 and December 31, 1977" for damages, and injunctive relief for the present lessee-dealers. Class Action Order No. 1.

This is not the first time since the court of appeals' decision that defendants have sought summary judgment. On March 31, 1980 and again on April 12, 1983, I denied defendants' motions for partial summary judgment. Class Action Order Nos. 6 & 69. Both motions for partial summary judgment were asserted as to the plaintiffs' trademark claim. In the memorandum opinion accompanying Class Action Order No. 69, I did not foreclose the possibility of summary disposition at a future date. I decided that on the existing state of the record genuine issues of material fact remained in dispute.

According to Plaintiffs' Preliminary Statement of Claim, filed pursuant to Class Action Order No. 63, as amended, the plaintiffs charge that:

Defendants, acting in concert, have undertaken over a long period of time a course of consciously parallel conduct to restrain competition in the sale of gasoline to their respective lessee-dealers, and in particular, to eliminate or substantially restrain price competition in the sale of their gasoline to lessee-dealers.

Plaintiffs contend that the concerted action of defendants, as hereinafter described, gives rise to five separate and distinct, but related claims, as follows, each of which constitutes a violation of Section 1 of the Sherman Act:

*Claim No. 1:* Defendants, acting in concert, have adopted and implemented various restrictive provisions in their leases, dealer supply agreements and other related agreements which have had the purpose and/or effect of requiring each branded lessee-dealer of a defendant to purchase all its gasoline from that lessee-dealer's lessor.

*Claim No. 2:* Defendants, acting in concert, and under the guise of protecting their respective trademarks, have imposed overbroad restrictions on the economic freedom of their branded lessee-dealers to purchase gasoline at wholesale and at competitive prices, and that, even if lawful in themselves, in concert, defendants' trademark practices have been used to accomplish an unlawful end—division of the wholesale market for gasoline and elimination or at least substantial restraint of price competition in the sale of gasoline to branded lessee-dealers of defendants.

*Claim No. 3:* Defendants, acting in concert, have refused to sell gasoline to the branded lessee-dealers of other defendants.

*Claim No. 4:* Each defendant, by a constellation of provisions contained in their package of leases and related agreements, tied the purchase of gasoline from the lessor to such lease and its related agreements.

*Claim No. 5:* Each defendant created a tying arrangement whereby the lessee-dealer was required to purchase exclusively from the lessor all gasoline pumped through lessor's trademarked dispensers regardless of the source or quality of the gasoline furnished by the lessor.

While each of the above claims are separate, they are also related; each claim supports and is a part of Claims Nos. 1, 2 and 3.

Considering the multitude of materials submitted on behalf of and in opposition to the dispositive motions, I will present only the defendants' general positions on both the motions for summary judgment and the motions to decertify the class.[4]

---

**4.** With both dispositive motions, the defendants    jointly filed a motion addressing points com-

The defendants' joint motion for summary judgment contends that summary judgment is appropriate as outlined in their brief, inter alia, for the following reasons:

1. Plaintiffs' trademark claims raise no genuine issue of fact and are insufficient as a matter of law because branded gasoline is a single product; and plaintiffs have failed to raise a triable issue of fact concerning the existence of an unlawful horizontal conspiracy to impose a tie-in because each defendant acted in its own economic self-interest.

2. Plaintiffs have failed to establish the fact of injury or impact resulting from defendants' trademark practices because gasoline is not homogenous; there is no element of causation; plaintiffs failed to take into account offsets; the use of Lundberg data is scientifically unsupportable and widely speculative; the margin requirements of the federal price controls preclude a finding of impact; the wholesale gasoline market was fully competitive; and plaintiffs' proposed damage formula involves an impermissible aggregate approach.

3. Plaintiffs have failed to demonstrate any genuine issue of material fact as to an alleged horizontal conspiracy to impose leasehold-gasoline tying arrangements because plaintiffs cannot demonstrate there is a tying arrangement at all; defendants lack the requisite economic power in the tying product, service station sites, to restrain competition in the tied product market, gasoline; the defendants' leases and supply agreements do not constitute unlawful tying arrangements; there is no direct or circumstantial evidence of a conspiracy; and plaintiffs have no theory of impact or damages to support their lease tie claims.

With regard to the motion for decertification, defendants' joint motion contends the class should be decertified for, inter alia, the following reasons:

1. Despite their representations to the Third Circuit, plaintiffs' method of proof is not class-wide in nature.

2. Plaintiffs' proposed proof of the alleged tie-in is not class-wide in nature.

3. Plaintiffs cannot establish market power on a class-wide basis.

4. Proof of fact of injury or impact would raise individual issues.

5. Plaintiffs do not have a legally permissible theory for proving the amount of damage to each class member on a common basis.

## II. *Summary Judgment Standard*

Before addressing the merits of defendants' contentions, the appropriate standards of review need be set out.

■ The summary judgment standard is well known: if the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then the "judgment sought shall be rendered forthwith." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the moving party bears the burden of proving that there are no genuine issues of fact, and doubts as to the existence of genuine issues of fact are to be resolved against the moving party. The non-moving party is entitled to have all inferences viewed in a light most favorable to the non-moving party. *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). The Court of Appeals for the Third Circuit has characterized the grant of summary judgment as a "drastic remedy." *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir.1974).

To the foregoing standards must be added the Supreme Court's admonition that in complex antitrust cases involving charges of conspiracy, summary procedures should only be used "sparingly":

We believe that summary procedures should be used sparingly in complex anti-

---

mon to all of the defendants. In addition, certain of the defendants filed individual motions emphasizing particular circumstances which

such defendants contended would require summary disposition in their favor even if denied on behalf of all the defendants generally.

trust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which has so long been the hallmark of "even handed justice."

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted). The Court has recognized that *Poller* involves a "concededly rigorous standard." *Hospital Building Co. v. Trustees of REX Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). While both the Supreme Court and the Third Circuit Court of Appeals have allowed summary disposition in antitrust cases, the above citations make plain that the district court must be absolutely certain there is no issue of material fact to be decided by the fact finder.

### III. *Summary Judgment Motions*

Although Plaintiffs' Preliminary Statement of Claim lists five claims, the primary thrust of plaintiffs' action involves three claims: (1) the refusal to deal claim (Claim No. 3 of Plaintiffs' Preliminary Statement of Claim); (2) the trademark claim (Claim Nos. 2 & 5); and (3) the lease claim (Claim Nos. 1 & 4. I will deal first with the question of conspiracy, which is involved in all three claims, then each claim seriatim, and lastly the questions of impact or fact of injury (damage) and damages.

### 1. *Conspiracy Claims*

In order to recover against non-lessor defendants on any of their claims, plaintiffs must prove a "contract," "combination" or "conspiracy" in restraint of trade by the defendants.[5] Plaintiffs contend that they can present evidence through expert testimony and material obtained through discovery that exhibits consciously parallel behavior that is not in the defendants' economic self-interest, and, in addition, that defendants had an opportunity to conspire. Defendants maintain that as a matter of law they acted in their economic self-interest and that plaintiffs have, at most, evidence of nothing more than parallel behavior coupled with a possible opportunity to conspire.

As a preliminary matter, it must be noted that throughout the voluminous briefs defendants referred extensively to deposition testimony of plaintiffs' expert witnesses in support of their motions for decertification and summary judgment. Reference to such testimony in the appendices superficially appears to confirm at least some of the defendants' contentions. In each instance, however, plaintiffs' responsive briefs cite other testimony by the same or another expert witness that supports plaintiffs' position. Considering that the only testimony of record was basic ily cross-examination by the defendants, it is not surprising to find many apparently contradictory statements in the several thousand pages of deposition testimony, spanning weeks of intensive questioning.[6] Such apparent contradictions or inconsistencies in the testimony do not mandate summary disposition. Rather, they create a classic example of issues of fact for the jury.

5. In Class Action Order No. 103, I expressly ruled that individual vertical claims against lessor defendants had not been and would not be certified for class treatment. Because class representatives Bogosian and Parisi were, at one time, lessee-dealers of Exxon, Gulf and Arco, plaintiffs possibly retained individual vertical claims against those three defendants. However, I declined to certify a class against those three defendants. The result of Class Action Order No. 103 is that class representatives Bogosian and Parisi may be able to maintain individual vertical claims against their respective lessors. I have not decided as of this time whether such claims will be tried together with or separate from the class-action horizontal conspiracy claims, if tried at all.

6. Nevertheless, I do not accept plaintiffs' argument that the court should not consider responses made by plaintiffs' experts in answer to defense counsels' questions that are unfavorable to plaintiffs' theories because it was only cross-examination.

Plaintiffs, not surprisingly, do not have direct evidence of a conspiracy. Plaintiffs do, however, have certain circumstantial evidence. Plaintiffs offer the testimony of expert witnesses that the defendants engaged in consciously parallel action which the experts assert was against each defendant's rational economic self-interest. Defendants maintain that as a matter of economic logic the conduct engaged in by all was in their own self-interest. As the record presently stands, I cannot say that there is no genuine issue of material fact on the conspiracy issue.

The isolated portions of the testimony of plaintiffs' experts that defendants cite fail to recognize that the issue whether certain conduct is or was against one's economic self-interest is a matter of perspective. When viewed with the alleged conspiracy in place, it may be that the defendants' actions were in their own economic interest as the market existed because of the alleged unlawful acts of defendants. Plaintiffs maintain, however, that the market must be viewed as it would have been absent defendants' alleged illegal conduct. Given that hypothetical market structure, would it have been in defendants' economic self-interest to act as they did? On the present state of the facts, I cannot say that there is no issue of fact in dispute concerning what would have been in defendants' self-interest.

■ The plaintiffs also have circumstantial evidence concerning the Petroleum Industry Marketing Attorneys' (PIMA) meetings which began in the middle 1950's. This evidence at least raises a possible inference concerning the opportunity to conspire. Defendants are correct that an opportunity to conspire alone is insufficient to establish a conspiracy. The PIMA materials, however, combined with plaintiffs' expert witness testimony regarding consciously parallel behavior against the defendants' economic self-interests creates genuine issues of fact as to whether there was an agreement, conspiracy, or combination among defendants in restraint of trade.

### 2. *The Refusal to Deal Claim*

■ Recognizing that plaintiffs' primary claims involve the trademark and lease claims, suffice it to say that as the record stands there is a genuine issue of fact whether defendants' failure to solicit lessee-dealers of a competitor was a result of concerted action on behalf of defendants.

### 3. *The Trademark Claims*

■ Plaintiffs two trademark claims are related but not dependent. First, plaintiffs claim that the use of the trademarks themselves is overbroad because defendants could protect their trademarks by less restrictive alternatives. Plaintiffs assert that an otherwise lawful use of trademarks to achieve the alleged unlawful end of supra competitive prices constitutes an antitrust violation. Second, plaintiffs claim defendants have created a tying arrangement by requiring lessee-dealers to purchase exclusively from the lessor all gasoline pumped through lessor's trademarked dispensers regardless of the source or quality of the gasoline.

Defendants, in their briefs and at oral argument, contend that summary judgment on the trademark claims is appropriate for any one of a number of reasons. Even if all of defendants' contentions were correct, it would affect only the second of plaintiffs' two trademark claims set out above. Plaintiffs would still be entitled to present their claim that defendants have used lawful trademarks to accomplish an illegal end, imposition of supra competitive prices on the market. Further, there are, at least on the present state of the record, genuine issues of fact as to two material issues: the "fungibility" issue and the "single product" question.

Plaintiffs concede that in order to prove their case on the trademark issue they must prove gasoline is fungible. Defendants cite and quote at least two of plaintiffs' expert witnesses who they maintain testified in deposition that all gasoline was not fungible. Plaintiffs counter with different quotations from the same witnesses

in support of their contentions. Once again, such conflicting testimony creates a factual issue for resolution. In addition, there is a question concerning the definition of "fungibility." Defendants evidently contend that plaintiffs' experts have testified that all gas must be chemically identical to be fungible, while in other instances, such experts defined "fungible" to mean interchangeable in the perception of the consumers, *i.e.*, the consumer perceives no difference. It would be difficult for me to rule as a matter of law that all gasoline is or is not fungible, if the definition of the term as referred to by the experts is uncertain.

As a final note on fungibility, plaintiffs will offer extensive proof that the defendant oil companies themselves regularly exchange large quantities of gasoline, which gasoline is then resold under a different defendant's trademark. Plaintiffs evidently have proof that in certain instances such gasoline is sold to the public by the acquiring defendant without that defendant's additives or meeting its own specifications for gasoline sold under its trademark. If nothing else, such evidence at least raises a possible inference that the defendants either considered or acted as if all gasoline is fungible.

As to the trademark claims, another genuine issue of material fact exists on the present state of the record, concerning the relationship between the trademark itself and the trademarked product. If the trademark is not separate from the gasoline, then only a single product would be involved and there could logically be no tie-in arrangement. Plaintiffs contend under *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), and its progeny that there are two distinct products here involved. Defendants rely on *Redd v. Shell Oil Co.*, 524 F.2d 1054 (10th Cir.1975), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976), and its progeny to distinguish this case from *Sie-*

*gel.*[7] In both Class Action Orders Nos. 6 & 69, I denied defendants' motion for summary judgment on the trademark issue without deciding whether the instant defendants' trademarks were separate products, preferring to wait for a fully developed record. While the present state of the record is quite developed, I have decided again to defer resolution of this crucial issue until the record is complete upon presentation of plaintiffs' case in chief at trial.

It may very well be that this single product issue will be suitable for deciding as a matter of law. Nevertheless, given the particular circumstances present, it may be that there is at least one critical fact issue for the jury to decide, *i.e.*, are the defendants engaged in the business of operating a total service package or are they primarily engaged in the distribution of gasoline?

The final issue under plaintiffs' trademark claims currently existing on the state of the record involves plaintiffs' claim that there was a less restrictive alternative means than use of the trademark restrictions for enforcing defendants' quality control standards. Plaintiffs claim that defendants could have protected their respective gasoline products by setting specification standards for their products that a lessee-dealer would have to meet in order to sell gasoline under that defendant's trademark. The lessee-dealer would then be free to purchase the gasoline from any source and sell it under his lessor-defendant's trademark; provided the gasoline met the specifications established by the lessor. This claim by plaintiffs essentially involves a contention that defendants by agreement or concerted action have used their trademarks, which in themselves may be lawful, to achieve the unlawful result of imposing supra competitive prices on their lessee-dealers. On the current state of the facts, even if all defendants' points were correct, this issue would remain. Under the antitrust laws, even if all of the defendants had a valid trademark pursuant to which each defendant individually could legally require

---

7. I will not repeat the arguments of counsel or set out the cases here. For an analysis of the parties' respective positions and the applicable case law, *see* Class Action Orders Nos. 6 & 69.

a lessee-dealer to purchase all his gasoline from the lessor trademark holder, the defendants could not jointly agree, combine or conspire to use their lawful trademarks to achieve an illegal purpose.

### 4. *The Lease Claim*

■ The gravamen of plaintiffs' lease claim is that the defendants, acting in concert, adopted and implemented a constellation of lease provisions that had the practical economic effect of requiring each lessee-dealer to purchase all of his gasoline from his lessor. One of defendants' primary contentions concerning the lease claim is that defendants as a matter of law do not possess the requisite economic power in the tying product, service station sites, to restrain competition in the allegedly tied product market, gasoline.[8] Application of the relevant case law to the current state of the record convinces me to the contrary.

The Supreme Court set out the appropriate standard for application of the "per se" unreasonableness rule in tying cases in *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 11, 78 S.Ct. 514, 521, 2 L.Ed.2d 545 (1958). In *Northern Pacific* the Court stated:

> [W]e do not construe this general language as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a "not insubstantial" amount of interstate commerce is affected).

*Id.* at 11, 78 S.Ct. at 521. The "sufficient economic power" standard was further explained in *Fortner Enterprises, Inc. v. United States Steel Corp.* (Fortner I), 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), and *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). In *Fortner I*, the Court stated that "the proper focus of concern is whether the

seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Fortner I*, 394 U.S. at 504, 89 S.Ct. at 1259. In *Loew's*, the Court opined: "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." *Loew's*, 371 U.S. at 45, 83 S.Ct. at 102.

Plaintiffs, during oral argument, stated that according to one of their sources of information the defendants at one time controlled in excess of eighty percent of the developed service station sites in the country. Surely, that data, if presented at trial, would permit a finding of sufficient economic power. Even absent such proof, there is support for a finding that defendants have sufficient economic power to appreciably restrain free competition. Under the teaching of *Loew's*, the crucial economic power could be inferred from the combined total share of the national gasoline sales of all the defendants. That the defendants control a large share of the wholesale gasoline market provides them with an advantage in the market for retail service station outlets. Individuals seeking to operate a service station site as a lessee-dealer, might find it preferable and more desirable to become a lessee-dealer of a major oil company defendant rather than a lessee-dealer of an independent or a jobber. The "tying product's desirability to consumers" under *Loew's* involves obtaining a developed service station leasehold owned by a major oil company refiner.

Using the teaching of *Fortner I*, the defendants certainly have the power to impose burdensome terms such as a tie-in, with respect to an appreciable number of prospective lessee-dealers. This power comes in part from their status as major oil

---

**8.** Defendants' other major contention is that the lease agreements do not tie the purchase of lessor's gasoline to the leasehold. As support, defendants cite plaintiffs' expert witness testimony. Plaintiffs, however, cite other testimony of those same expert witnesses in support of their position that the leases do have the practical effect alleged. Once again, the apparently conflicting testimony along with plaintiffs' other evidence reveals a record with genuine issues of fact regarding the practical economic effect of the defendants' leases.

refiners as well as plaintiffs' evidence that many, if not all, of the defendants engaged their marketing departments in the study and acquisition of attractive service station sites. The potential power to restrain any appreciable number of prospective lessee-dealers by thirteen major oil companies, many of whom undertook market surveys of proposed service station sites, cannot be totally ignored.

### 5. *Impact or Fact of Damage*

■ It was obvious to anyone present at oral argument on the summary judgment motion that I have serious problems with a number of aspects of plaintiffs' case. These perceived problems are especially acute with regard to both proof of the fact of damage and amount of damage. Although I am presently ruling that the state of the record reveals issues of fact preventing summary judgment, if at trial some of these serious problems remain, plaintiffs may not be entitled to go to a jury.

Plaintiffs' expert witness on damages, Dr. Paul Davidson, has testified in deposition that in his opinion the lowest Dealer Tankwagon (DTW) price paid by any of the defendants' lessee-dealers would still have been higher than the price gasoline would have been sold in the freely competitive market as proposed by plaintiffs. On the present state of the record such testimony is sufficient to withstand summary disposition. Defendants have brought to light, however, the following: Dr. Davidson has evidently admitted that he has no way of proving the accuracy of his statement, and that implementation of plaintiffs' proposed competitive market would result in the charging of higher service-station rents, franchise fees and other offsets that plaintiffs' expert witness agrees he has not considered. Defendants contend that such additional charges to the lessee-dealers would have driven the cost of gasoline purchased in such a freely competitive market above the cost to lessee-dealers in the existing marketing system. The end result, according to defendants, is that plaintiffs cannot prove that they, as a class, suffered any damage.

I have not decided at this time whether an expert witness's unsupported opinion without more would be sufficient at trial for plaintiffs to go to the jury on the question of fact of damage. I have decided such testimony as disclosed by existing depositions is enough to withstand summary judgment. Plaintiffs are aware, however, that they must "prove" some injury to all members of the class to succeed at trial. *See Bogosian,* 561 F.2d at 454 ("so long as the common proof adequately demonstrates some damage to each individual"). The proper time to decide whether plaintiffs have "proved" injury or fact of damage sufficient to present a jury issue will come at trial, after plaintiffs have presented their case.

### 6. *Damages*

This aspect of plaintiffs' case troubles me the most. Putting aside for the moment defendants' contentions regarding plaintiffs' proposed calculation of damages, I have a basic problem with plaintiffs' apparent proposal to submit only a damage formula. Evidently, plaintiffs contemplate a bifurcated trial where they could prove liability and fact of damage separate from actual damages. If and when the jury found in plaintiffs' favor, the plaintiffs' damage formula would then be submitted to a jury in a separate proceeding. Plaintiffs would then determine how much gasoline each plaintiff class member purchased during the relevant period and inject the numbers into the damage formula.

Notwithstanding the court of appeals' suggestion that bifurcation may be appropriate, I have not as yet ruled on the propriety of such a procedure. If I decline to do so, plaintiffs must be prepared to prove a total damage figure as opposed to a "measure of damage" or "damage formula."

The defendants challenge, inter alia, plaintiffs' ability to prove damages because the data plaintiffs are using itself is suspect and it only covers twelve randomly selected cities for brief periods, all of which are after the 1974 federal price controls. Defendants further contend that plaintiffs

could not possibly have suffered any damage during the period of mandatory price controls. Defendants also contend that the formula plaintiffs have chosen for calculating damages bears no relation to any supposed injury. Although defendants have raised a number of points that may have to be dealt with at trial if plaintiffs are to go to the jury, none of the contentions, individually or collectively, mandate summary judgment at this time. Plaintiffs, however, are on notice that at trial they must be able to "prove" damages in accordance with the applicable standards set out in antitrust cases.

### IV. *Decertification Motions*

Although the defendants' individual and joint motions raise a number of issues concerning class decertification, I will deal only with the three most serious contentions.

#### 1. *Class-wide Proof of Coercion*

In the *Bogosian* opinion the court of appeals held that "[i]f plaintiffs are able to show that the lease agreements in use by all defendants have similar clauses which have the practical economic effect of precluding sale of other than the lessor's gasoline" then "the lease agreement itself conditions the sale of one product (here a lease) upon purchase of another" and "proof of coercion is not an element of plaintiffs' case." 561 F.2d at 452 (footnote omitted). Thus, under the law of the case, the vexatious questions of whether proof of coercion is a required element of a tie-in claim and, if so, whether such proof could be done on a class-wide basis or need be proved individually, were decided in plaintiffs' favor.[9] Defendants contend that the Supreme Court's recent decision in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), overrules the court of appeals' holding in *Bogosian* that "proof of coercion is not a required element of plaintiffs' case." 561 F.2d at 452 (footnote omitted). Thus, the "coercion" issue that had been tempo-

rarily laid to rest in this case once again has reared its troublesome head.

In *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the court of appeals specifically rejected the district court's statement that " 'the Supreme Court has not set forth a coercion requirement in the tying cases.' 68 F.R.D. [65] at 98 [ (E.D.Pa.1975) ]." *Ungar*, 531 F.2d at 1218. After discussing the relevant Supreme Court cases, the court unambiguously stated:

In view of these teachings, we simply cannot accept the district court's view that the Supreme Court has not set forth a coercion requirement in tying cases.

*Ungar*, 531 F.2d at 1219. In the very next paragraph, the court reiterated its view that coercion was an essential element of a tying case when it discussed the logical question concerning proof of the element of coercion in a class action tying claim:

Saying that coercion is an element of a tying claim is, of course, not the same thing as saying that it must be established on an individual basis, but we think the two statements are logically related.... [I]n the context of a class action, the question is whether "individual coercion" must be established by each plaintiff.

*Id.*

The court of appeals went on to conclude in *Ungar*:

The district court erred in rejecting the individual coercion doctrine under the circumstances of this case. Where, as here, plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying.

*Id.* at 1226.

As I read *Ungar*, it seems apparent that the court of appeals decided two things: coercion is a requirement or essential ele-

---

9. Provided, of course, that plaintiffs could show the leases themselves had the practical econom-

ic effect alleged.

ment of a tying claim, and in putative class action tie-in suits not based on express contractual provisions, the requirement of individual coercion prevents class treatment. Sixteen months after *Ungar,* however, the court of appeals in *Bogosian* stated:

> Relying upon *Ungar,* defendants appear to argue that coercion is a requirement of proof in all tying cases. Neither *Ungar* nor any other case has so held....
>
> ....
>
> We therefore conclude that once a plaintiff proves that a defendant has conditioned the sale of one product upon the purchase of another there is no requirement that he prove that his purchase was coerced by the seller's requirement.

*Bogosian,* 561 F.2d at 449, 450. The court, per then Chief Judge Seitz, stated that the *Ungar* court held, *only on the facts present,* that coercion was a necessary element of a prima facie case and that each franchisee must prove coercion on an individual basis. However, the *Bogosian* court stated that in *Ungar* the court was "not articulating a separate legal element of proof" because "coercion is implicit when plaintiff proves the conditioning of sales of one product upon purchase of another." The *Bogosian* court read *Ungar* to have required coercion to be proven only because conditioning of the sale of one product upon purchase of another was not reflected in the agreement or in the operation of its terms. The *Bogosian* court went on to conclude that the "individual coercion doctrine" of *Ungar* had no application because *Ungar* expressly did not decide that doctrine's application to express contractual provisions, which may be the case in *Bogosian.*

The Supreme Court had the opportunity recently to consider per se tie-ins under the antitrust laws. In *Jefferson Parish,* the Court considered the validity of an exclusive contract between a hospital and a firm of anesthesiologists. In upholding the con-

tract under the Sherman Act, the Court, after canvassing its seminal tie-in cases, stated:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated....
>
> Accordingly, we have condemned tying arrangements when the seller has some special ability—usually called "market power"—to force a purchaser to do something that he would not do in a competitive market.... When "forcing" occurs, our cases have found the tying arrangement to be unlawful.

104 S.Ct. at 1558, 1559 (citations and footnotes omitted).

Absent the Supreme Court's holding in *Jefferson Parish,* I, of course, would have no cause to reconsider the court of appeals' binding decision in *Bogosian.* If, however, *Jefferson Parish* changed the law of tieins, I would be duty bound to follow such shift in the law. The determination of whether *Jefferson Parish* has changed the law in this circuit involves re-examination of both *Ungar* and *Bogosian.*

At the outset, there are certain parts of the two cases that are difficult to reconcile. In *Ungar,* Judge Aldisert, writing for the majority, plainly stated that "coercion is an element of a tying claim." 531 F.2d at 1219. In *Bogosian,* then Chief Judge Seitz, writing for the majority, stated with equal clarity that "once a plaintiff proves that a defendant has conditioned the sale of one product upon purchase of another there is no [coercion] requirement." 561 F.2d at 450.[10] Also, in *Bogosian* the court focused upon the *act of the seller:*

---

10. The court in *Bogosian* attempted to distinguish *Ungar* by stating that *Ungar* had only

decided on the facts present that coercion was a requirement in a tying case. Further, the facts

The antisocial conduct which the rule seeks to deter is the *act of the seller conditioning* sale of one product upon purchase of another. One can hardly imagine anything which would vitiate that purpose more than a requirement that a violation depends upon proof that the buyer bringing suit would not have purchased tied product but for the tie requirement. The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action.

*Bogosian,* 561 F.2d at 450 (emphasis in original). In *Ungar,* however, the court had focused precisely on the *buyer's state of mind:*

> The practical effect of [the district court's decision] is to substitute proof of economic power for proof of tie-in. Proof of economic power, must perforce, focus on the seller; but proof of a tie-in must focus on the buyer because a voluntary purchase of two products is simply not a tie-in.

*Ungar,* 531 F.2d at 1224.

> It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play: so long as "the buyer is free to take either product by itself there is no tying problem." [citation omitted]
>
> Moreover, we are aware of no principle that courts will not inquire into state of mind where that is relevant.

*Id.* at 1226.

Unfortunately, the *Jefferson Parish* opinion does not explicitly state whether coercion is a required element of a tying case. As I read the opinion, the Court's language is much more akin to the language in *Ungar* than that in *Bogosian* on the issue of coercion as a requirement in a tying case. Primary support for this position comes from the statement in *Jefferson Parish* that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer *either did not want at all, or might have preferred to purchase elsewhere on different terms.*" 104 S.Ct. at 1558 (emphasis added). Although the Court uses the terms "forcing" or "force" rather than "coerce" or "coercion," the concept is the same. The Court clearly focuses upon the buyer's state of mind, *i.e.,* a product "the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* This focus on the buyer represents the same concern as the *Ungar* court expressed: "[P]roof of a tie-in must focus on the buyer because a voluntary purchase of two products is simply not a tie-in." *Ungar,* 531 F.2d at 1224.

There are at least two other portions of the *Jefferson Parish* opinion that focus on the buyer's state of mind:

> When, however, the seller does not have either the degree or the kind of market power that enables him to *force customers to purchase a second, unwanted product* in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on compÉtition in the relevant market.

104 S.Ct. at 1561 (citations omitted) (emphasis added).

> The question remains whether this arrangement involves the use of market power to *force patients to buy services they would not otherwise purchase.*

104 S.Ct. at 1566 (emphasis added). There is no indication in *Jefferson Parish* that the "force" or "forcing" to which the Court constantly referred would be "implicit when plaintiff proves the conditioning of sales of one product upon purchase of another," as the court stated was the case

---

of *Ungar* required coercion "only because the conditioning of the sale of one product upon purchase of another was not reflected in an agreement or in the operation of its terms." 561 F.2d at 450. I have several problems with this. In *Ungar* the court did not speak of the coercion requirement in any limited sense.

Further, it seems logically inconsistent to posit that coercion is only necessary when there is no express contractual tie but not when there is one. Rather, it seems consistent to posit that coercion is always a requirement but in certain cases it may be presumed or inferred because of the existence of an express contractual tie.

with "leverage or coercion" in *Bogosian.* *See* 561 F.2d at 450.

Based upon the above analysis, it is my view that *Jefferson Parish* may well have finally settled the question of whether proof of coercion or forcing is an element of a tying claim. If I decided as much, that part of the court of appeals' decision in *Bogosian* providing that proof of coercion is not an element of plaintiffs' case would no longer be controlling. There is, however, no need for me to make such a determination for even. if I did, such a ruling alone would not require decertification of the class. As the court explicated in *Ungar:* "Saying that coercion is an element of a tying claim is, of course, not the same thing as saying that it must be established on an individual basis." *Ungar*, 531 F.2d at 1219.

In *Ungar*, the court expressly limited application of the "individual coercion doctrine" [11] to the situation where the plaintiffs placed no reliance on express contractual tie-ins. In *Bogosian*, the court noted that plaintiffs may be able to prove reliance on the lease agreements themselves, thus rendering the "individual coercion doctrine" of *Ungar* inapposite. Because *Jefferson Parish* did not involve a class action tying claim, the Court did not address how coercion could be proved (if it is indeed an element) in a class action. As such, there is no authority for me to disregard the court of appeals' prior rulings in this case. In other words, in order for me to decertify the class, as defendants contend, I must not only rule that *Jefferson Parish* requires proof of coercion in a tying claim, but also that such proof must always be done individually as to each class member, thus, effectively precluding litigation of tying claims by class action. Such a novel ruling in antitrust law must come from the. court of appeals or the Supreme Court, not a trial court extrapolating a Supreme Court opinion dealing with a related issue. I will

not, therefore, decertify the class for lack of class-wide proof of coercion.

### 2. *Class-Wide Proof of Impact and Damages.*

■ Although there are serious problems with both plaintiffs' proof of impact or fact of injury and damages, such problems do not warrant decertification of the class. I have already outlined these problems in discussing the motions for summary judgment and will not do so here. Defendants' arguments are primarily matters dealing with the substance or merits of plaintiffs' claims, and, therefore, do not require decertification. Suffice it to say that if the serious problems referred to earlier are not sufficiently addressed at trial, plaintiffs may not be entitled to have their case go to the jury.

### V. *Conclusion*

After considering a veritable mountain of briefs and appendices and after two full days of oral argument, it is my conclusion, as stated in the foregoing opinion, that both the motions for summary judgment and decertification of the class must be denied. Considering everything involved in light of the court of appeals' and the Supreme Court's strict views upon the propriety of granting summary judgment in such cases as the present (and the court of appeals' prior opinion), I cannoᴗ say at this time that there are no genuine issues of material fact that can proceed on a class basis. As a final note, although I have reached the merits of both motions, Judge Weinfield's cogent analysis in *United States v. Bethlehem Steel Corp.*, 157 F.Supp. 877, 879 (S.D.N.Y.1958), albeit in a different context, rings true here as well:

The Court does not reach the classical summary judgment question of whether there is a genuine issue as to any material fact. Upon further close study of the record, briefs and argument of counsel and considering the size of the industry,

---

**11.** The court in *Ungar* used the district court's definition of the "individual coercion doctrine":

Although the individual coercion doctrine has nowhere been explicated in detail, it appears to require proof by the plaintiff of such events and circumstances surrounding the relation-

ship between the franchisor and *each* franchisee as will demonstrate that the franchisee was *coerced* into agreeing to an anticompetitive tie, usually of equipment or supplies. 68 F.R.D. at 78.

*Ungar*, 531 F.2d at 1219.

the vast amount of factual material to be analyzed and reviewed in reaching a decision, the multitude of problems in the case, the likely impact of a decision upon the [oil] industry in particular, and upon the economy of the country in general, and the admitted significance of a ruling under [Section I of the Sherman Act], I am persuaded that a decision after trial will be the more desirable procedure in the matter. It will serve to bring into sharper focus certain issues of importance which have been obscured by the voluminous affidavits with their statements, counterstatements and alternative positions, and the conflicting conclusions which the parties contend are to be drawn from the multitude of facts and statistics presented.

The case will proceed to trial as heretofore scheduled.